# Darlington R. Kulp et al., Plffs. in Err., *v.* James Bird.

In an action of trespass for cutting standing timber contrary to the act of March 29, 1884, *held*, that an equitable title to land by purchase from the owner and continuing to hold the same by virtue of the agreement until the trespass was committed is sufficient to sustain the action.

*Held, further*, that where the latter part of a will varies from the first part so that both cannot stand together, the latter part, as being the last thought of the testator upon the subject, controls.

Cited in Alexander v. Ellis, 123 Pa. 88, 16 Atl. 770, sustaining a verdict for double damages.

NOTE.—That the owner of the equitable title may maintain trespass against an intruder for cutting timber trees under the act of March 29, 1824, is also sustained in Walton v. Pollock, 12 Pa. Co. Ct. 216.

A land patent is granted by the commonwealth to the persons who are entitled and who have paid; and if another procures the patent to be made to himself, he takes as trustee, and it does not preclude the former from setting up whatever title they have to the property.

A contract signed by parties competent to enter into it is admissible in evidence, notwithstanding it is also signed by parties incompetent to contract.

Where the jury gave single damages only for the timber thus cut, the court has the right, under the act, to double such damages.

A tenant by the curtesy has only a life estate, and when he dies nothing descends from him to his heirs.

(Argued March 3, 1887. Decided March 14, 1887.)

January Term, 1887, No. 2, E. D., before MERCUR, Ch. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. Error to the Common Pleas of Columbia County to review a judgment on a verdict for plaintiff in an action of trespass for cutting timber. Affirmed.

This action was brought by James Bird against Darlington R. Kulp, Curtis G. McWilliams, and William C. McConnell, doing business as Kulp, McWilliams, & Company.

The facts sufficiently appear from the charge of the court given below.

The plaintiff offered in evidence a certified copy of the will of Henry Fisher, deceased, dated September 24, 1816, to show that the land was devised to the mother of James Bird and that from her, title vested in James Bird, the plaintiff; to be followed by proof that her title became vested in the plaintiff.

Objected to by defendants: (1) Because by the second section of the will, the tract of land surveyed on warrant to Henry Fisher, given in evidence, was devised in fee unto John Fisher, and Caleb Fisher, without reservation; and if Sarah Bird acquired any right to the 10 acres from said land devised by the second section to Caleb and John Fisher, by words expressly conveying the fee, it was only a life estate, as the will was executed and probated before the act of April 8, 1833; (2) it is irrelevant for the purpose for which it is offered.

By the Court: These objections are overruled; the plaintiff alleges that he can show title in himself; we will have all the evidence out and then we can judge of the title.

Plaintiff offered in evidence the agreement between the plain-

tiff and his mother, brothers and sisters, for the purchase by him of this 10 acres of woodland, to be followed by regular deeds of conveyance, executed and delivered according to law.

Objected to by the defendants: (1) Because according to the terms of the offer it is merged in the deeds subsequently executed and delivered to the plaintiff; (2) because it is signed by three married women, whose husbands did not join and did not acknowledge it as required by the act of assembly; and it is as to them, null and void; (3) because it is irrelevant for the purpose for which offered or for any purpose in this case.

By the Court: We will allow this to be read in evidence; it is void as to third parties.

Defendants, *inter alia,* presented the following points:

2. The plaintiff having alleged in his declaration that he was seised in his demesne as of fee of and in the 10 acres of land described in his declaration filed in this case; and having claimed triple damages for cutting timber trees upon the same, is bound to show that he was the owner of said land prior to the bringing of this suit; and, having failed to establish such ownership, cannot recover in this suit, and the verdict must be for the defendants.

*A.* I answer, substantially, as I have already charged, that if James Bird acquired an equitable title to an interest in the land on which the alleged trespass was committed by purchasing from the legal owner, and continued to hold the same by virtue of articles of agreement until a trespass was committed thereon before the commencement of this suit, the allegation of his seisin and title as owner is sufficiently sustained for the purposes of the suit.

3. The plaintiff, having shown by the patent to John Fisher, offered in evidence by him, that the complete title was vested in the said John Fisher on the 15th day of July, 1873, and having failed to show any conveyance of this title to him, or that the same became in any way prior to the bringing of this suit vested in him, cannot recover.

*A.* I refuse to affirm that point. Under the evidence in the cause, John Fisher, having obtained a patent in 1873 of the land granted to Henry Fisher in 1814, the purchase money having been paid by Henry Fisher, and he, John, being the devisee of Henry Fisher of the amount of land in the contract except the

10 acres, was trustee of the portion devised to his sister, Mrs.
Bird. The rule of law is that the patent is granted by the com-
monwealth to the persons who are entitled and who have paid.
Here John Fisher was the devisee, along with his brother Caleb,
of a portion of the land; it was therefore proper enough for him
to procure a patent and to complete the title which had come
down to him as devisee under his father; and therefore he ap-
plied to the land office and obtained a patent, which has been
read in your hearing, for the whole of it covering the ten acres,
an undivided patent. From what transpired in the trial of the
cause, we may fairly presume that he claimed the whole of it
on the ground that he and Caleb were first named in the will,
and that therefore he had a right to it. He having taken a
patent for the whole, and the commonwealth in that patent set-
ting forth that the purchase money had been paid by Henry
Fisher at the time of granting the warrant, and that he, John,
had derived title from Henry, that was true in part, because he
had so derived it and his patent covered the whole.

It is claimed here that the plaintiff, having given this patent
in evidence, cannot say that anybody else than John Fisher had
the title; but when you take into consideration all the circum-
stances: that his sister Sarah, his brother Caleb, and he were
devisees under the same will and for portions of the same tract,
and the recital that his title had come from Henry Fisher, in
the judgment of the court, it does not preclude the defendants
(plaintiff) claiming under Mrs. Fisher (Bird) from setting up
whatever title she had to the property.

4. The plaintiff having shown that the title to the land vested
in John Fisher in 1873, and the uncontradicted testimony being
that the said Fisher title vested in defendants, and that they
were the owners of the said lands at the time of the alleged tres-
pass, the verdict must be for the defendants.

A. I decline to charge as requested in this point. The de-
fendants stand where John Fisher stood; they have the rights of
John Fisher, and what John Fisher had the right to do in re-
spect to this property they had the right to do, and no more;
they acquired his right, title and interest; and under that they
make their defense. We have already said to you that for 10
acres, wheresoever they lie, John Fisher was trustee for his
sister, who died in 1879. She at that time was living, and he
took it as trustee for her; of course when she died, the residue

which she had descended to her children, provided she had not bargained it away or contracted to its being bargained away, as already stated.

5. That the plaintiff has shown no such title or possession as entitles him to recover.

*A.* This point is refused in what we have already said; we have explained our views on that subject.

6. If the court decline to affirm the above, then they are respectfully requested to charge the jury that the 10 acres of land mentioned in the fifth section of the Henry Fisher will is required to be located at the northeast corner of the Henry Fisher survey, and not taken from the east end of said tract as claimed by the plaintiff, and should be located in the northeast corner, the course of the eastern line of said tract for the distance of 21 perches and thence by a line parallel with the northern line of said tract, a sufficient distance to make 10 acres.

*A.* I decline to charge as requested in this point, and I submit to the jury the question upon the drafts and the evidence before the court of the location of the line of the 10 acres, on the Henry Fisher tract. You know by drafts what is called for on the east end of the tract, and you have seen and will have before you the shape of the Henry Fisher tract, at the east end along the narrow piece of land. It is claimed by the defendants that this division would split the east end which is 40 rods wide into two parts, making it 41 or 42; that the division line ought to be in the center so as to be within the meaning of the will as to the northeast corner.

You are to take into consideration all the circumstances,— among other things, the shape of the tract, whether the meaning of it would be that it should be so as to include nothing but the northeast corner, and so run far enough down to make 10 acres, or whether the language of the testator means in effect off the east end of the tract, or whether it is confined to that particular corner; I do not think that this is a matter of law for the court to determine under the evidence; especially, as it is shown before you that the grantee, James Bird, never laid off the 10 acres in the way that is now claimed by the defendants, but laid it off many years ago from the east end of the tract, and, so far as appears, claimed that end of the tract down to the present time; and, if the east end of the tract was to be divided so as to make the 10 acres lie upon the one side, the one half, whatever

the course or location would be, then the proper way is to say that what lies on one side of the middle line, between this and the northeast corner on that side, the plaintiff is entitled to, and to no other portion of the land.

The court charged the jury as follows:

"In 1824 an act of assembly was passed, which provides that 'in all cases where any person or persons shall cut down or fell, or employ any person or persons to cut down or fell, any timber tree or trees growing upon the land of another, without the consent of the owner thereof, he or they so offending shall be liable to pay to such owner double the value of such tree or trees so cut down or felled, or, in case of conversion thereof to the use of such offender or offenders, triple the value thereof.'

"The action which we are now trying is brought under that act of assembly; the plaintiff, Bird, declares that timber was cut upon his land contrary to the provisions of that act. Whether the defendants knew that they were trespassing, if they were, is immaterial; the law was unquestionably intended to preserve the timber in the then more sparsely settled portions of the commonwealth, where it might be somewhat difficult to ascertain who cut the timber; and hence, rather in the nature of a penalty, damage was given beyond the value for the purpose of preventing the depredations of marauders; so that the act makes no distinction between those who cut knowingly and those who do not; if they cut upon the land of another and without his consent, it is a trespass for which the owner can recover under this act of assembly more or less, according to what the trespasser did upon the ground. If he merely felled the timber, double damages were given; if he felled it and converted it to his own use (which properly means carried it away), he incurred the penalty of triple damages, partly by way of compensation to the owner and partly to prevent trespasses.

"By this same act, if the trespasser knew that he was cutting timber on the land of another, he might be indicted; but that would make no difference with the right of the owner of the land to recover for the damages which he sustained.

"The plaintiff here, seeking to establish title to the land on which the alleged trespass was committed, produced in evidence a warrant to Henry Fisher for a tract of land described therein, dated on the 8th day of September, 1824. In pursuance of that

warrant, the deputy surveyor laid off 93 acres and some perches,. and returned the survey to the land office. This of itself did not confer a legal title; that passes from the commonwealth only when it has given its deed, called a patent; but applying for a: warrant for a quantity of land, having that land surveyed and returned to the land office, and paying the purchase money,. gives an equitable title, which descends to the heirs of the war-rantee.

"Henry Fisher died on the 11th day of September, 1824,. having first made his will, the second clause of which gives to: Caleb and John, sons of the testator, 'All that certain mes-suage' etc., describing it, 'with all the appurtenances thereto be-longing or in anywise appertaining; to have and to hold to the said Caleb and John Fisher, their heirs and assigns forever, as tenants in common, and not as joint tenants'—subject to their making certain payments. That was actually conveying the fee: simple to the land therein described.

"In the fifth clause of the will, the testator provides: 'I do: give and devise to my daughter Sarah, intermarried with James-Bird, and to her heirs and assigns forever, all that certain mes-suage and tract of land, with the appurtenances thereto belong-ing, situate in Catawissa township, Columbia county, containing,. 92 acres and 46 perches, be the same more or less; also 10 acres of woodland, to be taken off the northeast corner of the 90-acre tract which is devised to Caleb and John Fisher, and ad-joining the Philip Mettler.' The larger tract is given to the sons and to the widow (daughter) and her heirs as: strongly as language could provide, and then follows the clause that raises the question here, 'and also 10 acres of woodland to: be taken off the northeast corner.'

"It is claimed by counsel for the defendants that the clause giving the whole tract to the two sons in fee is inconsistent with the clause giving a part of the same tract to Sarah, and that the: latter has not the same strength, not having the words, 'heirs and assigns forever' following it, and that therefore there was: but a life estate in Sarah, the daughter; that the two clauses are, upon any other interpretation, irreconcilable, or that there: is no way by which this will can be construed so as to make both these clauses consistent and operative.

"It is the duty of the courts, in construing wills, to carry out if possible the intention of the testator; and that intention is

to be gathered from the whole will and from all its parts, and if necessary, there may be a transposition of words in order to accomplish that matter, the carrying out of the intention of the testator; but where it is found, after proper endeavor, impossible to reconcile two clauses of a will, then the rule applies that a latter clause prevails over a former clause, just as the last will and testament must prevail over previous wills.

["Where the latter part of a will varies from the former part, so that both cannot stand together, then the latter, as being the last thought the testator had upon the subject, controls. I therefore instruct you that the 10 acres off the northeast corner was by the will of her father given to Sarah; when he died in 1824 the 10 acres became hers absolutely, in fee. I come to this conclusion from the phraseology of the will, which, after giving the 90 acres, then says, 'also the 10 acres,' mentioning where it lies. The word 'also,' as there used, means, 'in like manner,' 'I give her the 10 acres as I have given her the 90 acres;' that is the meaning of the word 'also,' as I construe it, the same estate in the 10 acres as was given in the 90 acres. The 90 acres were given to her and her heirs and assigns forever.]

"[Matters remained in that way down to 1837, when an article of agreement was entered into, purporting to be signed by the heirs of James Bird, the husband of Sarah Fisher, who had died in September, the exact date, I think, is not in evidence. The parties to this agreement called themselves his heirs; they were not his heirs as to this land; they were his heirs as sons and daughters, and therefore his heirs of whatever interest he had in this land; but he had no interest in this land, because the fact that he was the husband of Sarah, which made him tenant by the curtesy, gave him only a life estate; and when he died nothing descended from him to his heirs.]

"[That article of agreement is signed by three sons, I think, and three daughters of Mrs. Sarah Bird; we allowed it to be read in evidence, because there were upon it the names of parties who were competent to enter into such a contract; but these three married women could not dispose of their land except in the way pointed out by law,—namely, by a writing executed jointly with the husband, and separately acknowledged by the wife, examined apart by the magistrate. That was not done in

this case; therefore their signatures to the paper are absolutely void, and it passed no title whatever to James Bird.

"A contract signed at that time by the brothers alone would have bound them, and would have conveyed an equitable right, if they at that time had any title to the land; but their mother was living and they were not heirs of their mother while she lived. But Sarah Bird, who owned the land, signed that paper along with the others; her name, I believe, is not in the body of the instrument; but she signed it along with them, knowing that the land was to be sold to James Bird for the consideration mentioned in the deed. By assenting to the sale to be made by her daughters and her sons to her son James Bird, she acquiesced in the transfer; and although her children at that time had no title in the land whatever, she had; and if she agreed that they might make sale for valuable consideration, she had the right to do so, and, doing so, bound herself; and if she was bound, when she died her heirs were bound by her act in her lifetime; so that by her assent and acquiescence and joining in the contract by which this land was conveyed to James Bird, he acquired an equitable title to it, such a title as any man acquires when he enters into a contract for the purchase of land for the consideration named; and when, from the terms employed, it is fair to conclude that he has the right of possession, he sustains any loss that accrues to the property bought.

"If one should purchase a dwelling-house by contract with the former owner, and if before deed made, and before the purchaser paid, the house should burn down, it is the loss of the vendee and not of the vendor. So in the purchase of timber land; if one has acquired an equitable title and bound himself to pay, and a trespass is committed upon the land, he is the owner to such an extent as to entitle him to maintain trespass under the act of 1824; he sustains the loss, and ought to have the remedy which the law gives to redress the wrong committed upon him. Mere possession would not of itself entitle a claimant to recover against a trespasser under this statute; one having the possession or (and) the immediate right of possession can maintain trespass for any injury he has sustained. Cutting down timber is an injury to the inheritance, and he who has the equitable title may maintain trespass.]

"Counsel for the defendants request us to charge:

[The court here read and answered defendants' points and then continued.]

"If the cutting of timber trees was upon the 10 acres at the east end of the tract, and if that was the land devised, then of course you will have to ascertain how much timber was cut upon that portion; if, on the other hand, it is divided so as to split the tract in two, then you have the difficult task of ascertaining how much timber was cut on the one side and how much on the other. If you say the trees in question were cut on the 10 acres, taking them off the east end, you will go through the evidence to see how many trees or how much timber was taken from that quarter; if you come to the conclusion that the tract should be divided so as to make the 10 acres in the northeast corner, then you will have to ascertain, as best you can, the value of the trees cut off that. But where a party seeking to recover damages fails in his evidence to show the amount of the injury that was done him, the jury have no right to guess at how much it would be.

"Much has been said in the course of this trial in regard to the possession of this land. It is unseated land, uncultivated land. The only possession that has been had, so far as the evidence goes to show, is the occasional (not every year) taking some timber for wood, or ties, or something else, in the course of a long period of time, off this tract. There is no evidence that either party has gained title by the statute of limitations, by peaceable, notorious, hostile possession, uninterrupted for the period of twenty-one years.

"The occasional coming for fire wood does not give title by possession, however long continued, at intervals, these trespasses may be; but if the person has an equitable title, and if the land has been taxed to him and he has for a long period of years paid the taxes, or those under whom he claims have for a long period of time paid all the taxes assessed against him, this payment of taxes, in connection with the equitable title, is worthy of some consideration on account of his right to the land and his possession of the property. While the title to the land of another cannot be gained by simply paying taxes upon it, yet, if there is payment of taxes, and the claimant exercises acts of ownership over the land, the fact of the payment of taxes may be taken into consideration in deciding the question of his possession.

"Something also has been said about the sale for the taxes of 1874 and 1875. The evidence shows an assessment of taxes

during these years, and a sale in 1876 to John Fisher, and it is claimed that that sale covered this land. In order to make a valid sale of unseated lands, there must be a valid assessment made by competent authority, and the taxes must have remained unpaid for one whole year before the sale. If the taxes were paid by the claimant of the land, a sale for taxes would not be valid, because the taxes were paid; a sale of the land where the taxes are paid is simply void, carries no title.

"Did James Bird pay the taxes for the years 1874 and 1875, the sale for which was made in 1876 ? He testifies that his father paid the taxes before; and that he, although he took no receipt, paid taxes for these later years, for years before and some afterwards, and all the time down to 1886; that being the case, the tax sale in 1876 was invalid and passed no title to John Fisher. The case stands then upon the title that he held before that time. I believe these are all the questions raised relating to the title.

"You turn your attention to the question whether the defendants either cut, or procured to be cut, timber upon this land. They claim to be the owners of the property through their purchase from John Fisher. It seems that they employed a man by the name of Shields to cut timber on that tract; and evidence has been given here (which you will call to mind) as to what these defendants did do in reference to cutting that timber. If they employed Shields to cut the timber, and knew and understood that he was cutting this timber on these ten acres, and if they employed men to haul off the timber that was cut, the cutting would be for their benefit and assented to by them; it would make them trespassers. If they employed Shields to cut the timber on a particular portion of the land, as a contractor, and restricted him to their land, and he cut over upon somebody else's, they would not be responsible; but, if they acquiesced in his act, drew off the lumber, they would be responsible for the acts of one who was their agent in that respect. If you find that the plaintiff is entitled to recover, the next question is the amount. You will have, I presume, from the counsel, a statement of the number and size of the trees alleged to have been cut and the quantity of lumber in them and the number of ties taken; it will be impossible for you to remember all these items without some such memorandum.

"The price of timber land is not the sole test of the value of the timber upon it, although it is worthy of your consideration.

The value of the trees, where they stood when they were cut down, as standing trees, is the question, not as trees felled and the bark peeled off and carried away and sold; the law gives the value of the trees as trees, not as manufactured lumber or anything else, but as trees as they stood there on that ground. In ascertaining that, the character and quality of the timber, the size of the trees, the amount of lumber that was in them, what trees of that size and location would sell for, may be considered.

"If you believe the testimony on the part of the defendants, there is nothing in their acts or conduct that goes to show that they intended anything more than pursuing what they believed to be their rights; but I have already instructed you that this matters not, so far as the plaintiff is concerned, whether they acted sincerely or otherwise. It is not a case for vindictive damages; you have no right to go beyond the value of these trees, no matter what the conduct of these defendants was. In estimating the damages, you should be just to both parties, ascertaining the value of the timber cut.

"If you find for the defendants, the verdict should be, generally, 'for the defendants.' If you find that a portion of the property was cut down and was left on the ground, not converted, you will give double damages for that portion; but for what was converted, if any, triple damages; designating how much you find of double damages, and how much of triple damages; this may be difficult for you to ascertain, but you have to take the case where the parties leave it. As I understand it, at the time of bringing this suit, a good deal of timber beyond a certain size still lay upon the ground where it was cut, and has been taken away by these defendants since suit brought and within the last year. The plaintiff is restricted to damages sustained up to the time of bringing this suit in October, 1882, and cannot recover for anything this side of that; the rights of the parties are to be determined as of that date; whatever has been taken away since suit brought is not a subject for damages here; for the timber that lay there on the ground the plaintiff could have maintained trover, provided he has a right to this land. You may find, in looking at the testimony, that the witnesses upon the one side or upon the other put the damages beyond any reasonable amount, beyond anything that you ever heard of in the way of damages for timber cutting; or you may find them too low in their estimates; the facts are for you;

and between the evidence that is given on the one side and the other you must endeavor to get at such a medium as will do justice between these parties; giving due consideration to all the evidence in the case. You have no right to compute any interest."

The jury returned the following verdict:
"We find a verdict for the plaintiff for $625.10.

| | |
|---|---|
| 447 oak at 70cts., | $312.90 single damage. |
| 223 chestnut at $140 | $312.20 double damage. |

$625.10."

Counsel for plaintiff moved the court to double the $312.90, single damage for oak; and increase the $312.20, double damage for chestnut to such an amount as would be treble the amount of single damage.

By the Court:

The declaration alleges the cutting of timber by the defendants on lands of the plaintiff and converting them to their use. The timber shown on the trial to have been cut was oak and chestnut, all that was cut was not converted by the defendants. . . .

If the first words (of the verdict) are to be taken as the whole verdict, this motion ought not to prevail. It is manifest, however, that the jury did not so intend. Whether the verdict is strictly according to the evidence on the trial is not now the question, as neither party has asked for a new trial. It must now be construed by itself. And in order that it be rightly understood, or rather in order that it may be construed so as to be consistent with itself, the several parts must be considered with the whole.

When a jury in such a case say that the damage which they find is double damage, the court has no right to double the amount so found. In this case the item, 223 chestnut, $1.40, $312.20, double damage, means just what it says, that the value and aggregate as put down are found to be double damage. Suppose the jury in any case under the statute should say in their verdict that they find for the plaintiff a named sum treble damages; it would be error for the court to enter judgment for treble the amount so found.

The verdict declares that the damages have been already trebled by the jury. The same reasoning applies with equal force when the verdict finds a sum said by them to be double damage. If the jury intend in such a case that the amount shall be doubled by the court, that intention must be indicated in some other manner than by finding that the double damage is so much. When a sum is found by the jury as "single damage," they already show that they have neither doubled nor trebled the amount of damage which they have found for the plaintiff, leaving the increase for the action of the court, as shall be in accordance with the law.

Thus construed, this verdict is consistent with itself throughout, and means just this: We find for the plaintiff a verdict of $625.10, made up in this $312.90, damages subject to increase by the court and $312.20 damages which we find to be double the actual damages; total, $625.10, subject as aforesaid. Whether the jury so intended is to be gathered from their written verdict, and not from what the court might have found as fact under the evidence.

In view of the fact that some of the oak cut was shown to have been converted by the defendants and some was not, we concluded that the counsel for the plaintiff, in view of the difficulty of ascertaining the proportions of each, have moved the court to double damages found for the oak. The motion to that extent we are of opinion ought to be granted, but as to chestnut I am of opinion that the amount of damages fixed by the jury cannot be either doubled or trebled by the court.

Double damages for the oak, $625.80.
Damages for the chestnut as
    found by the jury,        312.20.
Interest from date of verdict.

                              $938.00.

The assignments of error specified the admission of evidence as above noted, the answers to defendants' points, the portion of the charge inclosed in brackets, and the action of the court in increasing the amount of the verdict rendered by the jury.

*John G. Freeze* and *S. P. Wolverton*, for plaintiffs in error. —Under the pleadings in the case, the plaintiff was bound to

show that he was the owner of the land at the time the timber was cut, to enable him to recover. Purdon's Digest, last ed. p. 1635, § 2; Tammany v. Whittaker, 4 Watts, 221; Welsh v. Anthony, 16 Pa. 255, 256.

By the second section of the will of Henry Fisher, the land was devised in fee, unto Caleb and John Fisher; and as the will was made and probated prior to the act of April 8, 1833, Sarah Bird only took a life estate under the fifth section.

The court was in error in changing the verdict. Hughes v. Stevens, 36 Pa. 320; Newcomb v. Butterfield, 8 Johns. 342; Campbell v. Finney, 3 Watts, 84; Clark v. Sargeant, 112 Pa. 16, 5 Atl. 44.

*E. R. Ikeler, C. W. Miller,* and *Grant Herring,* for defendant in error.

PER CURIAM:

We have given to this case a thorough examination, and have carefully considered all the specifications of error; yet we are not able to find any error in the record. We do not discover that the learned judge, in his able and clear charge, stated either the law or the facts incorrectly. The rulings relating to the admission of evidence are free from error. The record shows affirmatively that the jury gave single damages only for the oak; this gave a clear right to the court to double those damages. Clark v. Sargeant, 112 Pa. 16, 5 Atl. 44.

Judgment affirmed.